## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | | |
|---|---|---|
| JOHNETTA CARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| LOUISVILLE JEFFERSON | ) | Case No.  3:20-CV-818-CRS |
| COUNTY METRO GOVERNMENT, | ) | |
| CITY OF LOUISVILLE, Louisville | ) | |
| Police Detectives TONY FINCH, | ) | |
| GARY HUFFMAN, TERRY JONES, | ) | JURY TRIAL DEMANDED |
| JIM LAWSON, SHAWN SEABOLT, | ) | |
| Louisville Police Sergeants TROY | ) | |
| PITCOCK, JAMES HELLINGER, in | ) | |
| their individual capacities. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

NOW COMES Plaintiff, JOHNETTA CARR, by her attorneys LOEVY &
LOEVY, and complaining of Defendants CITY OF LOUISVILLE, KENTUCKY;
Louisville Police Officers TONY FINCH, GARY HUFFMAN, TERRY JONES, JIM
LAWSON, SHAWN SEABOLT, and Sergeants TROY PITCOCK and JAMES
HELLINGER, and other unknown officers from the Louisville Police Department, in
their individual capacities, and alleges as follows:

## Introduction

1.    On October 23, 2005, around 9:00 a.m., Mr. Planes Adolphe was found dead in front of his apartment building in Louisville, Kentucky.

2.    Plaintiff, Johnetta Carr, had nothing to do with Mr. Adolphe's death.

3.    Plaintiff has always been an innocent woman accused of a crime she did not commit.

4.    DNA testing on physical evidence recovered from the crime scene excluded Ms. Carr as a contributor.

5.    Because the physical evidence excluded Ms. Carr from having any involvement in the murder, the Defendants fabricated and coerced false statements from Ms. Carr's codefendant, Carla Sowers, and jailhouse informants.

6.    With this fabricated and false evidence, Officers arrested Ms. Carr on January 5, 2006 for Mr. Adolphe's murder.

7.    Based on the fabricated false evidence and the withheld exculpatory evidence, the Defendants initiated charges against Ms. Carr for first degree murder, robbery, burglary, and tampering with physical evidence.

8.    The Defendants also initiated charges against two other innocent individuals: Shawndric Williams and Carla Sowers.

9.    Due to Defendants' fabricated and false evidence, on April 14, 2008, Ms. Carr took an *Alford* plea to second degree manslaughter, conspiracy to commit robbery, conspiracy to commit burglary, and tampering with physical evidence and was sentenced to 20 years' imprisonment.

10.    Tragically, Plaintiff Johnetta Carr spent more than 12 years imprisoned and on parole for a crime she did not commit.

11.    On December 9, 2019, Kentucky Governor Matthew Bevin pardoned Ms. Carr because of her actual innocence.

## Jurisdiction and Venue

12.    Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

13.    This Court has jurisdiction of Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction of her state law claims under 28 U.S.C. § 1367.

14.    Venue is proper under 28 U.S.C. § 1391(b) and (c).  Ms. Carr currently resides within the judicial district, the events giving rise to the claims asserted in this action occurred in this district.  And, on information and belief, all parties reside in this judicial district and are subject to personal jurisdiction of the courts of this judicial district.

## The Parties

15.    Plaintiff Johnetta Carr is a resident of Louisville, Jefferson County, Kentucky.

16.    At all times relevant to the Complaint, Ms. Carr was a resident of the Commonwealth of Kentucky and lived in the Western District of Kentucky, Louisville Division.

17.    Defendant Louisville Jefferson County Metro Government ("Metro Government") formed on January 6, 2003, when Jefferson County and the city of Louisville merged.  The Metro Government is a municipality that is a political subdivision of the Commonwealth of Kentucky and is a municipality of Jefferson County and the City of Louisville and was the employer of Defendant Officers.  Since January 6, 2003, the Metro Government has been the employer of the aforementioned officers.  Defendant Metro Government is responsible for all policies, practices, and customs of the former Louisville Police Department, the Jefferson County Police Department, and the Louisville Metro Police Department (LMPD).

18.    At all times relevant to this Complaint, prior to January 6, 2003, the City of Louisville was responsible for all policies, practices, and customs of the Louisville Police Department and Jefferson County was responsible for all policies, practices, and customs of the Jefferson County Police Department.  Since the merger of the Louisville and Jefferson County governments, the Louisville Police Department and the Jefferson County Police Department merged, and their successor entity is the LMPD.[1]

19.    Defendant City of Louisville, until January 6, 2003, was a political subdivision of the Commonwealth of Kentucky.  At all times relevant to this Complaint until January 6, 2003, it was a city of the first-class with home rule as enabled, defined, and empowered under KRS 83.410–83.660, as well as KRS Chapter 83A, 91, and 91A.  Until January 6, 2003, the City of Louisville was responsible for

---

[1] For simplicity, the Complaint refers to both the Louisville Police Department and its successor entity the Louisville Metro Police Department as "LMPD."

the policies, practices, and customs of the Louisville Police Department. The city of Louisville's successor is Metro Government. The City of Louisville is responsible for the acts of Defendants while employed by the City of Louisville and while acting under color of law and within the scope of their employment.

20.     At all relevant times, Defendants Tony Finch, Gary Huffman, Jim Lawson, and Shawn Seabolt were police officers or detectives with the Louisville Police Department, or its successor LMPD, and employed by Defendant City of Louisville and Metro Government, and acting under color of law and within the scope of their employment.

21.     At all relevant times, Defendant James Helllinger and Troy Pitcock were police officers or sergeants within the Louisville Police Department, or its successor LMPD, and employed by Defendant City of Louisville and Metro Government, and acting under color of law and within the scope of their employment.

22.     Defendants Finch, Lawson, and Pitcock are each sued in their individual capacities.

## FACTUAL ALLEGATIONS
### Murder of Planes Adolphe

23.      Planes Michael Adolphe worked as a cab driver for Green Cab in Louisville, Kentucky.

24.     At the time, Adolphe lived alone in the Americana apartment building at 142 East Kingston Avenue in Louisville.

25.     Mr. Adolphe was from Haiti, and was part of the close-knit Haitian community in Louisville.

26.    On Saturday, October 22, 2005, Mr. Adolphe and several friends played dominoes at his apartment.

27.    Mr. Adolphe and Ms. Carr had been dating for about two months at that point, but Ms. Carr never visited his apartment that evening.

28.    Later, detectives found a ValuMart grocery store receipt in the front pocket of Mr. Adolphe's pants.

29.    The receipt was dated October 22, 2005, at 10:47 p.m.

30.    Sometime that night after the trip to the grocery store, Mr. Adolphe was violently murdered.

31.    The next morning, Sunday, October 23, 2005, a neighbor called the Louisville Metro Police Department to report someone laying in front of the Americana apartment building.

32.    At 9:18 a.m., LMPD Officer Tom Goins responded to the scene.  He saw a black male—soon identified as Mr. Adolphe—lying face-up on the ground in front of the building.

33.    Officer Goins called EMS, who pronounced Mr. Adolphe dead at the scene.

34.    At 9:37 a.m., Officer Goins called the LMPD homicide unit.  Defendants Gary Huffman, Terry Jones, and Tony Finch responded.

35.    Finch was lead investigator.

36.    Sergeant Troy Pitcock was Finch's supervisor.

37.     According to Defendant Finch's report, Mr. Adolphe had an electrical cord around his neck.

38.     The cord had been cut with a knife from a fan in the victim's bedroom.

39.     Officers recovered a button and an artificial fingernail from the crime scene.  They also found pieces of packing tape on the ground, which appeared to have been placed around the victim's wrists and ankles.

40.     Officers discovered that Mr. Adolphe's wallet, cell phone, and cab—a green 1999 Ford Crown Victoria—were missing.

41.     Officers spoke to several observers at the scene who were friends or acquaintances of Mr. Adolphe.

42.     Jacquelin Louissaint told Defendant Huffman that he had heard someone had been assaulted, so he came to see if he knew the person.

43.     Mr. Louissaint identified the victim, and then became upset and starting running to his car.  He told Defendant Huffman that he was going to his church to inform the Haitian community what had happened.  Louissaint said he knew the victim, and that the victim had been saving money to buy a plane ticket to Haiti.

44.     Another individual, Maxone Desgranges, informed Defendant Huffman that he had been playing dominos with Mr. Adolphe until about 10:00 p.m. the night before.  When he left, a woman entered the rear kitchen door and spoke with Mr. Adolphe.

45.    Also, Defendant Huffman documented that Mr. Aldophe had been keeping a truck in a storage facility and was trying to sell the truck to fund a trip to Haiti.

46.    Another individual, Kenold Decius, reported to Defendant Huffman that he discussed purchasing the truck with Mr. Adolphe for $3,800. Money changed hands, he said, with more money owed to Mr. Adolphe on delivery.

47.    Defendant Huffman documented that Mr. Decius was concerned about the truck purchase because he already had paid some money for it, and wanted to see what could be done to secure the truck.

48.    Defendant Shawn Seabolt interviewed several individuals at the homicide office.  Lico Guerrer and Auguste Isaraque both knew about Mr. Adolphe's truck.  Mr. Guerrer informed Defendant Seabolt that the victim had told him a few days before that someone wanted to buy the truck for $3,000, but the victim wanted $5,000 for it.  Mr. Isaraque said that someone had given the victim $2,000 or $3,000 as a deposit, and then had paid the victim $800 to return his deposit.

49.    None of the witnesses mentioned or implicated Johnetta Carr, Carla Sowers, or Shawndric Williams.

50.    Around 2:30 p.m. on October 23, 2005, Officer Mike Bishop found Mr. Adolphe's cab behind the Jackson Woods Apartments at 1029 South Jackson Street.

51.    This apartment building was about six miles away from Mr. Adolphe's apartment.

52.    Ms. Carr had no connection to this apartment complex, nor did either of her co-defendants, Carla Sowers or Shawndric Williams.

53.    When officers found the car, the exterior of the car was intact, but the interior was in disarray: papers were on the floor, the center console had been knocked over, the stereo was missing, and there were wires hanging out of the dashboard.

54.    Two Jackson Woods Apartments tenants—Shameca Beals and Naisha Adams—each informed Defendant Hellinger that they had seen the distinctive green cab parked in the same spot the night before.  Ms. Adams saw the car around 10:00 p.m. and Ms. Adams saw the car around 10:30 p.m. on October 22.

### Despite the Evidence Against Him, Officers Fail to Meaningfully Investigate Steve Louis as a Suspect

55.    Mr. Louissaint was one of the victim's best friends and was with him the evening before the murder.

56.    By October 27, 2005, Mr. Louissaint contacted the homicide office saying he knew who committed the murder.

57.    After, Defendant Finch interviewed Mr. Louissaint, who had been at the crime scene four days before.

58.    Mr. Louissaint told Defendant Finch that "Steve" who worked at Wal-Mart killed Mr. Adolphe.

59.    Mr. Louissaint said that he had witnessed Steve and the victim arguing about a girl, and that Steve had threatened to kill the victim.  Steve tried to physically

attack the victim, but someone pulled Steve away. This incident happened near the victim's apartment.

60. Mr. Louissaint heard from Steve's friend that Steve had continued threatening to kill the victim.

61. Critically, Mr. Louissaint also learned from Steve's friend that another friend confessed to helping Steve kill Mr. Adolphe.

62. Mr. Louissaint did not know the identity of Steve's friend who had this information about Steve and someone else committing the murder. But Louissaint showed Defendant Finch the house where Steve's friend lived. The address of that house was 222 Iroquis.

63. Mr. Louissaint and Defendant Finch drove by 222 Iroquis and saw a black male sitting in the front yard. Mr. Louissaint was sitting very low in the back seat of Finch's patrol car, and the man was wearing a hoodie, so Mr. Louissaint could not be sure it was Steve.

64. Mr. Louissaint ultimately identified Steve J. Louis from a photograph.

65. Next, Defendant Finch relied on a confidential informant to provide him with Steve Louis's location.

66. On November 3, 2005, the informant provided Defendant Finch with Louis's location. Defendant Finch followed Louis's car and stopped him for failing to stop at a stop sign.

67.    During the stop, Mr. Louis said his name was Steve John Louis and that he went by the name "John."  But Defendant Finch knew that Louis's middle name actually was Jocelyn, and that he did not go by John.

68.    According to Defendant Finch's report, Mr. Louis was "nervous and deceptive" about his identity.

69.    Appropriately suspicious, Defendant Finch arrested Mr. Louis for not having his driver's license with him.  Defendant Finch took Mr. Louis to the homicide office and Mr. Louis waived his rights and agreed to speak about the homicide around 8:30 p.m.

70.    During the interview, Louis admitted that he knew the victim.

71.    Louis agreed to take a polygraph examination.  Detective Ingram administered a polygraph at 11:30 p.m..  Mr. Louis failed three times.

72.    Louis could not provide Defendant Finch his whereabouts the week before or after the murder, except that he was at his friend Darrell Taylor's house at 222 Iroquis a week after the murder.

73.    Louis maintained that he learned about Mr. Adolphe's murder from his mother.  Louis admitted that even his own mother and brother (Renold Louis) kept accusing him of the murder.

74.    Desperate to save himself, Mr. Louis falsely informed Defendant Finch that he thought that Ms. Carr had something to do with the murder.

75.    Defendant Finch knew that Mr. Louis was lying when he denied involvement and implicated Ms. Carr.

76.     But, unable to crack Steve Louis, Defendant Finch ended the interrogation around 7:00 a.m. the next morning, when Defendant Seabolt transported Louis to the Louisville Metropolitan Department of Corrections for a minor traffic violation.

77.     Instead of conducting a legitimate investigation into Steve Louis, the obvious suspect, Defendant Finch decided to manufacture false and fabricated evidence to frame Ms. Carr and her co-defendants.

### Defendant Finch Learns that Louis Threatened to Kill Witnesses for Speaking to Police

78.     A few days later, on November 30, 2005, another witness—Jean Batelot—informed Defendant Finch that Steve Louis and his mother threatened to kill Louissaint and another witness because they believed they were talking to police about the murder.

79.     Despite knowing that Mr. Louissaint and Darrell Taylor knew Steve Louis and an unidentified friend had committed the murder, the Defendant Officers withheld all their investigative efforts into Mr. Louis.

80.     They never disclosed that Darrell Taylor had direct knowledge about who committed the murder.

81.      And despite Steve Louis's deceptive behavior and admissions that his mother and brother believed he committed the murder, the Defendant Officers never documented their investigation into him as a suspect in the murder outside of what's discussed above.

82.     The Defendant Officers failure to apprehend Steve Louis had a tragic consequence beyond three wrongful convictions in this case:  Darrell Taylor shot and killed Steve Louis in 2012.

## Defendants Huffman and Finch Disregard Key Phone Record Evidence

83.     The Defendants continued ignoring key exculpatory evidence in their effort to falsely pin the murder on Ms. Carr.

84.     As explained above, the perpetrator(s) stole Mr. Adolphe's cell phone, and the Defendant Officers never recovered it.

85.     Defendants Finch and Huffman subpoenaed Mr. Adolphe's phone records, and learned that the perpetrator had continued using the cell phone after Mr. Adolphe's death.

86.     Someone used the phone to make numerous calls after Mr. Adolphe's death, including calls to Los Angeles and Florida.

87.     Defendants Huffman and Finch knew that Ms. Carr and her codefendants—who were just teenagers—had no reason to make these calls.

88.     Defendants knew this evidence—*i.e.*, that someone continued using the cell phone to make long-distance phone calls—was exculpatory evidence, but they decided to take the easy route and frame their teenage suspects.

## Detective Finch Coerces False Statement from Carla Sowers

89.     Instead of conducting a legitimate investigation resulting in the apprehension of the true perpetrator—Steve Louis—the Defendants conspired to frame Plaintiff for crimes she did not commit.

90.    As part of this quest, Defendant Finch spoke with Carl Sowers, Carla's father, on December 19, 2005

91.    Mr. Sowers told Finch that Carla had nothing to do with the murder.

92.    Defendant Finch told Mr. Sowers that he did not think Carla was involved in the murder, and that he was looking at two other suspects: Steve Louis and Shawndric Williams.

93.    On December 20, 2005, Finch met with Defendant Pitcock and requested surveillance on the house where Carla Sowers was living so that officers could arrest her.

94.    Pitcock agreed, and Carla Sowers was arrested on a bench warrant for shoplifting that same day.

95.    Carla was just 19 years old at the time.

96.    Defendant Finch began interrogating Carla about the homicide around noon on December 20, 2005.

97.    Carla maintained that she knew nothing about the murder.

98.    She told Defendant Finch she had been with Shawndric and Sharday Williams and Whitley Hawkins the night of the murder. At the time, Carla was dating Shawndric Williams and was living in the Williams's house at 923 Clarks Lane.

99.    Early in the interrogation, Detective Finch assured Carla that he knew she didn't do the murder.

100.    Eventually, Defendant Finch began accusing Carla, Shawndric, and Ms. Carr of committing the murder.

101.    Carla, just a teenager, maintained her innocence for hours on end.

102.    But Defendant Finch used coercive interrogation methods.

103.    Defendant Finch promised to help Carla if she would just repeat the false story he wanted her to tell.

104.    Defendant Finch knew that this story was false at the time he was feeding it to Carla.

105.    Defendant Finch manufactured a false statement for Carla that implicated Ms. Carr and Shawdric Williams in the murder.

106.    Convinced she had to tell Defendant Finch something, Carla eventually broke down and repeated the false narrative that Defendant Finch provided to her.

107.    After Carla was coerced and promised consideration in exchange for repeating a false and fabricated statement, Defendant Finch told her he was going to record her statement.

108.    When Finch returned with the recorder, Carla told Defendant Finch that he had coerced her into repeating a false and fabricated statement, that he had fed her the whole story, and that she had just gone along with it.

109.    Carla maintained the truth was that she knew nothing about the murder.

110.    She told Defendant Finch she didn't know who did the murder or who had used her phone to call the victim.

111.    Detective Finch still had no legitimate evidence against Ms. Carr.

112.    Finch concluded the interrogation around 11:00 p.m., some 11 hours after it had begun.

113.    Carla Sowers was then arrested for murder.

114.    As explained more fully below, Carla Sowers's fabricated statement was inconsistent with the physical evidence.  First, forensic testing showed there was no tape residue on the victim's ankles, so Carla's statement that Ms. Carr had bound his feet was false.  Second, the cord used to strangle the victim came from a fan in the bedroom, not from the television.  And no DNA testing from the scene of the crime matched Carla Sowers, Shawndric Williams, or Johnetta Carr.

115.    Defendant Finch knew that the statement he fabricated for Carla Sowers was false but plowed forward with charges anyways.

**Plaintiff's Rock-Solid Alibi**

116.    Plaintiff had a rock-solid alibi for the time of the murder.

117.    On the evening of October 22, 2005, Plaintiff was at the Williams's house on 923 Clarks Lane.

118.    Cedric Williams lived in the house with his son (Shawndric Williams) and daughter (Shakedra "Sharday" Williams).  Numerous individuals were at the house the night of October 22, 2005, including Cedric, Sharday, and Shawndric Williams, Carla Sowers (Shawndric's girlfriend), and Whitley Hawkins (Sharday's friend), "Big Mike," "Steve", Cindy (Cedric's girlfriend), someone named Amy, and other unknown individuals.

119.    Carla Sowers, Sharday Williams, Whitley Hawkins, and Ms. Carr all drove around together that evening in Carla's car.

120.    They stopped at a White Castle restaurant around 1 a.m., then returned to 923 Clarks Lane and went to bed.

121.     Ms. Carr slept next to her friend, Whitley Hawkins, that night.  They were sleeping under the same blanket on a couch, and Sharday Williams was sleeping on the floor in the same room.

122.    Carla, Shawndric, Steve, and "Big Mike" slept in the basement.

123.    Whitley, Sharday, and Ms. Carr woke up around 9:30 a.m. the next morning (October 23, 2005), and Ms. Carr left the house around 10:30 a.m. with Roger Dooley, another man she was dating at the time.

124.    As demonstrated, Plaintiff could not have been involved in the murder.

**Defendant Lawson Fabricates Statement from Ms. Carr's Alibi Witness**

125.    Because Plaintiff's alibi was solid, the Defendants conspired to manipulate the alibi witnesses in order to secure her wrongful conviction.

126.    As part of the plan to frame Plaintiff, Defendant Lawson interviewed Whitley Hawkins on January 14, 2006.

127.    Defendant Lawson provided Whitley with different theories about various people who had supposedly committed the murder.

128.    In short, Defendant Lawson encouraged Whitley to falsely implicate Ms. Carr and others in the murder.

129.    Refusing Defendant Lawson's request, Whitley told Lawson who had been at 923 Clarks Lane on October 22, 2005; that she and Ms. Carr had driven around with Carla Sowers and Sharday Williams that evening; and that she had slept next to Ms. Carr on a couch that night.

130.    Whitley specifically told Defendant Lawson that Ms. Carr could not have done the murder and that she was an alibi witness for her.

131.    Ignoring Whitley's information, Defendant Lawson fabricated a false report where he documented that Whitley said she was a very sound sleeper, and that she could not say whether Johnetta left or came back to the house that night.

132.    Lawson fabricated this statement.

133.    Whitley Hawkins never told Lawson that she was a sound sleeper or that she did not know whether Plaintiff had left the house that evening.  Instead, Whitley told Lawson that she knew Ms. Carr  never had left the house that night and that she knew Ms. Carr had not committed the murder.

134.    To frame Plaintiff, the Defendants fabricated false evidence and even deliberately manipulated evidence to get around Plaintiff's alibi.

135.    They did this because, as described above, they already fabricated and coerced a false statement from Carla Sowers implicating Ms. Carr.

### Physical Evidence Excludes Ms. Carr and Refutes Defendant Officers' Theory of the Case

136.    The scientific testing proves Plaintiff's innocence and Defendants' egregious misdeeds.

18

137.    On March 15, 2006, Defendant Finch sent the physical evidence the Kentucky State Police for examination.

138.    Defendant Finch received the forensic testing results on September 29, 2006.

139.    The physical evidence excluded Ms. Carr and her co-defendants as having committed the murder, and was inconsistent with the Defendants' theory of the case.

140.    DNA from the cord used to strangle the victim was a mixture. Ms. Carr, Shawndric Williams, and Carla Sowers all were excluded as contributors. The victim could not be excluded as a contributor to the mixture. This result means there was more than one DNA profile on the cord and the victim could have contributed one profile, but none of the three wrongfully convicted individuals could have contributed it.

141.    Defendant Finch believed that the pieces of tape found at the crime scene had been used to bind the victim's wrists and ankles. But forensic testing revealed that there was no adhesive residue on the victim's ankles. And, forensic testing showed that a scraping from the victim's left wrist was inconsistent the tape found at the crime scene. (The scraping from the victim's left wrist contained off-white adhesive that was different than the gray adhesive from the pieces of tape found at the scene).

142.    The DNA found on the artificial fingernail found at the crime scene contained an insufficient amount of DNA for analysis.

143.    Defendants never recovered the victim's cell phone, wallet, or the missing stereo from Mr. Adolphe's cab.

144.    And there was no evidence that Ms. Carr or her codefendants ever had money from the purported robbery.

145.    Officers recovered Mr. Adolphe's cab the day after the murder. According to Carla Sowers's false and fabricated statement (and fabricated statements from jailhouse informants, described below), Shawndric Williams had stolen Mr. Adolphe's car keys and dumped the cab somewhere.

146.    But officers found no physical evidence—DNA, latent prints, or otherwise—connecting Shawndric Williams, Carla Sowers, or Ms. Carr to the cab.

147.    There was no evidence explaining why Shawndric Williams would have taken the cab at all, or why he would have left it in the Jackson Woods apartments parking lot.  Shawdric was unfamiliar with the area, and would have had no way to return home to Clarks.  Plus, two Jackson Woods tenants reported having seen the cab parked there as early as 10:00 p.m. the night before.

148.    No physical evidence from the crime scene, Mr. Adolphe's cab, or Carla Sowers's car linked Ms. Carr, Shawndric Williams, or Carla Sowers to the murder.

149.    Although the physical evidence was completely inconsistent with Ms. Sowers's false and fabricated statement, the Defendant Officers persisted in their effort to frame Ms. Carr and her codefendants for the murder.

## Lacking Reliable Evidence, Finch Manufactures Statements from Jailhouse Informants

150.    Because the Defendants were desperate to secure Plaintiff's wrongful conviction, they resorted to fabricating false statements for jailhouse informants in exchange for undisclosed promises of consideration.

151.    On November 16, 2006, Detective Finch fabricated a statement for inmate Lori Deckard.

152.    The fabricated false statement manufactured for Deckard stated that Plaintiff confessed to her that had been mad at the victim, and had used Carla's cell phone to call him.  Then Plaintiff persuaded Carla to drive her and Shawndric to his apartment.  They started arguing with the victim and then robbed him.  Shawndric told Carla to get the cord while Plaintiff found some tape.  Carla and Plaintiff taped the victim and Shawndric strangled him.  Then they grabbed his cell phone and keys and, inexplicably, dragged him outside.  Shawndric took the cab and dumped it somewhere, and Plaintiff and Carla left in Carla's car.

153.    Defendant Finch forced Ms. Deckard to go along with the false manufactured statement.

154.    By this point, Detective Finch already manufactured false evidence against Carla Sowers through two other jailhouse snitches—April Sharp and Dana Lowder.

155.    The Defendants obtained statements from Sharp and Lowder on February 6, 2006 and March 16, 2006 respectively.

156.    The Defendants manufactured the false statements and were aware of their falsity at the time they were manufactured.

157.    Carla Sowers never confessed to either jailhouse informant and their resulting statements were false, fabricated, and a product of undisclosed promises of consideration.

158.    But there is more.  In January of 2007 Defendant Finch fabricated a false statement from another jailhouse informant, Raymond Jeffries, implicating Shawndric Williams.

159.    By January 2007, the Defendants manufactured four fabricated statements for jailhouse informants implicating each of their suspects.

160.    This pattern was not by chance, but rather, part of a larger pattern of fabricating false statements for jailhouse informants that existed for decades within the Louisville Police Department to frame innocent people for crimes they did not commit.

## Ms. Carr's Wrongful Prosecution

161.    On January 6, 2006—two weeks after Carla Sowers's false and coerced confession—Ms. Carr was arrested for Mr. Adolphe's murder.

162.    Defendant Finch and Defendant Hellinger interrogated Ms. Carr after her arrest, and she maintained her innocence.

163.    Defendant Finch was aggressive with Ms. Carr—who was a child at the time—and threatened to put her in jail for life if she did not cooperate.  He called her a murderer, a bitch, and a whore, and refused to let her call her mother.

164.    Ms. Carr maintained her innocence, and stated that she had been at the Williams's house at 923 Clarks Lane the night of the murder with Whitley Hawkins and Sharday Williams.

165.    Defendant Finch testified falsely in front of the grand jury. There, Defendant Finch presented the false and fabricated evidence that he manufactured early in the investigation.  Namely, Defendant Finch presented Carla Sowers's false statement and the manufactured statements from the jailhouse informants.

166.    A grand jury returned an indictment against Ms. Carr, Carla Sowers, and Shawndric Williams on April 27, 2006, charging her with one count of murder, one count of burglary, one count of robbery, and one count of tampering with physical evidence.

167.    Ultimately, Ms. Carr took an *Alford* plea in April 2008 to second degree manslaughter, conspiracy to commit robbery, and conspiracy to commit burglary, and tampering with physical evidence.

168.    Ms. Carr maintained her innocence, and took an *Alford* plea because the false and fabricated evidence against her seemed insurmountable and the Defendants conspired to withhold their egregious misconduct, as explained below.

169.    The Defendant Officers knew that the witness statements used to initiate charges against Ms. Carr were false and fabricated through improper tactics. Still, the Defendant Officers used these statements to initiate charges against Ms. Carr.

170.   The Defendants never informed the Commonwealth that Carla Sowers' statement implicating Ms. Carr in the murder was false and coerced; that Ms. Carr had a solid alibi; that Defendants fabricated a statement from Ms. Carr's alibi witness and failed to document that the alibi witness knew Ms. Carr could not have committed the murder; that the physical evidence and phone records excluded Ms. Carr as the culprit; and that Defendants had a suspect (Steve Louis) but abandoned that investigation once they secured a false statement from Carla Sowers.

171.   If Defendants had disclosed the extent of their egregious misdeeds, Ms. Carr would have not taken the *Alford* plea and instead gone to trial.

### The Louisville Defendants' Pattern and Practice of Misconduct to Secure Wrongful Prosecutions and Convictions

172.   The investigative misconduct that led to Plaintiff's arrest, indictment, malicious prosecution, wrongful conviction and imprisonment was not an anomaly. Rather, it was simply the way Louisville police closed cases.

173.   Specifically, before, during, and since the unlawful investigation, prosecution, and conviction of Plaintiff, the City of Louisville and LMPD (the "Louisville Defendants"), by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by LMPD investigators, including but not limited to the following:

   a.   fabricating evidence;

   b.   failing to promptly document and disclose material, exculpatory and impeachment evidence to prosecutors;

   c.   destroying evidence;

24

    d.     failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations;

    e.     disregarding the Fifth and Fourteenth Amendment rights of criminal suspects and defendants; and

    f.     engaging in the ongoing affirmative concealment and coverup of police misconduct.

174.    Before, during and after the unlawful investigation, prosecution, and conviction of Plaintiff, the Louisville Defendants, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline LMPD investigators regarding fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to the following:

    a.     conducting witness identification procedures, including photo arrays and live lineups;

    b.     maintaining physical evidence and accurately documenting investigative work;

    c.     documenting and promptly disclosing exculpatory and impeachment evidence to prosecutors;

    d.     conducting constitutionally adequate investigations with objectivity rather than tunnel vision; and

    e.     conducting custodial interrogations and witness interviews.

175.    Pursuant to these unconstitutional policies, customs, or patterns and practices, municipal defendants' final policymakers abdicated and effectively delegated to detectives, including but not limited to defendants Finch, Huffman,

Jones, Lawson, Seabolt, Pitcock, and Hellinger the authority and discretion to conduct and supervise investigations with deliberate and reckless disregard for their constitutional duties and the rights of innocent suspects.

176.    As a result, detectives, officers, and supervisors, including but not limited to defendants Finch, Huffman, Jones, Lawson, Seabolt, Pitcock, and Hellinger routinely and knowingly engaged in investigative misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

177.    The unconstitutional municipal policies, customs, and practices of investigative misconduct and failure to supervise, train and discipline police were reflected in the multiple acts of misconduct and illegality committed by multiple Louisville police officers, detectives and supervisors in relation to multiple suspects and witnesses in the underlying criminal investigation, as described above.

### The Louisville Defendants' Custom and Practice of Fabricating Inculpatory Evidence and Failure to Supervise and Discipline Police Regarding their Obligations not to Fabricate Evidence

178.    By 2005, it was a well-established legal principle and a fundamental tenet of responsible police practices that fabricating evidence against a suspect violates the suspect's constitutional rights. Nonetheless, the municipal defendants, by and through their final policymakers and delegees, failed either to supervise their police to ensure they did not fabricate evidence, or to discipline police when they did. These municipal failures created an environment of impunity in which fabricating evidence was tacitly, and sometimes explicitly, authorized.

179.    These systemic municipal lapses and unconstitutional fabrications of

evidence were the norm by 2005. For example, in 1992, LMPD officers Steve Clark and Joe Carroll falsely reported in their investigative notes that rape suspect **William Gregory** had volunteered guilty knowledge regarding a rape for which he had been arrested—a list of the items stolen from a rape victim's apartment— falsely claiming that they had not provided this information to Gregory. Officers Clark and Carroll then testified to these false allegations at Gregory's trial. As Gregory was innocent of the rape in question, he could not have and did not volunteer the nonpublic information regarding the items stolen from the victim's apartment. This information was fed to him by LMPD officers Clark and Carroll, who were aware of the inculpatory value of nonpublic facts originating from a criminal suspect. The officers thereby fabricated this evidence to create probable cause to prosecute Gregory.

180.    In 1992, in accordance with these unconstitutional customs and practices, LMPD officers wrongly arrested, deliberately manufactured a case against, destroyed and ignored exculpatory evidence, maliciously prosecuted and covered up or withheld exculpatory and impeachment evidence from other innocent suspects, **Jeffrey Clark and Keith Hardin**, who were wrongfully convicted of a crime for which they did not commit. Clark and Hardin experienced many of the same types of misconduct that led to Plaintiff's wrongful conviction.

181.    Similarly, in accordance with these same municipal customs, practices, and lapses in training and supervision, in 1993, Det. Handy and other defendants deliberately fabricated a confession from murder suspect **Edwin**

**Chandler**. After falsely telling him that he failed a polygraph and engaging in other coercive misconduct, Det. Handy and others coerced Chandler to confess. To make the confession sound more believable, they fed Chandler nonpublic facts about the crime and then misrepresented how his "confession" was elicited in order to make it appear that Chandler had guilty knowledge of nonpublic facts only the perpetrator could have known.

182.    In 1996, in accordance with the same unconstitutional customs and practices, LMPD wrongly arrested, deliberately manufactured a case against, destroyed and ignored exculpatory evidence, maliciously prosecuted, and covered up or withheld exculpatory and impeachment evidence from another innocent suspect, **Kerry Porter**, who was wrongfully convicted of a crime he did not commit. LMPD officers manufactured inculpatory statements from jailhouse informants by feeding them details of the crime. LMPD offices withheld the fact that one of the informants was a longtime paid informant for the Louisville Police Department who was paid to provide information on more than one hundred other cases.  Porter was only exonerated after the news media obtained evidence from a subsequent investigation showing that a different suspect had committed the murder. Despite having this information, the LMPD cold case squad did nothing to inform Porter or his defense counsel of it. DNA evidence subsequently proved Porter's innocence.

183.    Here, LMPD Defendants Finch, Huffman, Jones, Lawson, Seabolt, Pitcock, and Hellinger in accordance with the Louisville Defendants' unconstitutional policy or practice of manufacturing false evidence and failing to

train, supervise, and discipline officers fabricated the evidence that led to Plaintiff's

indictment and conviction. Specifically:

> a.   The false statement fabricated by Defendant Finch for Carla
>      Sowers;
>
> b.   The false statement fabricated by Defendants for the jailhouse
>      informants.

### The Louisville Defendants' Custom and Practice of Suppressing Brady Evidence and Failure to Train, Supervise and Discipline Officers Regarding *Brady* Obligations

184.   By 1992, police had a clearly established constitutional duty to disclose

exculpatory and impeachment information to prosecutors under *Brady v. Maryland*,

*Giglio v. United States*, and their progeny. Failing to carry out these *Brady*

disclosure duties posed obvious risks for criminal defendants, yet the Louisville

Defendants utterly failed to supervise or train police in this regard. Specifically, the

Louisville Defendants did nothing to ensure police understood their *Brady* duties

and carried them out in practice.

185.   E. Douglas Hamilton, the LMPD Police Chief in 1992 and 1993, has

testified under oath that in 1992, at the time of the underlying investigation, LMPD

officers were "confused" about their *Brady* duty to disclose exculpatory information

to prosecutors, but received no ordinary or remedial training on this duty.

186.   Despite Hamilton's admission, the Louisville Defendants took no

action to properly train LMPD officers in how to meet their *Brady* obligations.

187.   As a direct result of the Louisville Defendants' deliberate indifference

to the obvious risk this endemic *Brady* confusion posed to criminal defendants—and

specifically to innocent suspects like Plaintiff—the confusion persisted throughout the 1992 investigation and indeed for years thereafter without intervention from supervisors or policymakers.

188.    For example, as noted above, pursuant to this custom and practice, LPD officers in 1992 arrested, maliciously prosecuted and covered up or withheld exculpatory and impeachment information—including evidence of their own misconduct—from another innocent suspect, **William Gregory**. As a result, Gregory was wrongly convicted of two rapes he did not commit and endured more than seven years of imprisonment before he was proven innocent and released.

189.    Gregory sued. In that action, *Gregory v. City of Louisville, et al.*, 444 F.3d 725 (6th Cir.), *reh'g denied* (2006), the Sixth Circuit found that the City of Louisville had been deliberately indifferent in failing to train LMPD officers on their *Brady* and *Giglio* disclosure obligations.

190.    Here, the very same municipal customs, practices and systemic lapses in training, as well as systemic lapses in supervision and discipline, led police to arrest, maliciously prosecute, and cover up and withhold exculpatory and impeachment information from Plaintiff, including:

      a.    the fact that the LMPD Defendants withheld exculpatory evidence that Carla Sowers was coerced into giving a false and fabricated statement;

      b.    the fact that the LMPD Defendants withheld exculpatory evidence regarding the fabricated jailhouse informant statements;

      c.    the fact that the LMPD Defendants withheld exculpatory evidence implicating alternate suspects in the murder

### The Louisville Defendants' Final Policymakers and Delegees Were on Notice of the Systemic Unconstitutional Customs, Practices and Lapses in Training, Supervision and Discipline

191.    The municipal defendants' unconstitutional policies, customs, or patterns and practices of investigative misconduct and failure to supervise and train detectives and officers were reflected in numerous prior cases and investigations of which the municipal defendants and their final policymakers were on notice before the underlying murder investigation.

192.    For example, the municipal defendants knew and were on actual notice that Defendant Finch had, in other prior felony investigations, destroyed evidence that had substantial power to prove suspects' innocence. Yet, the municipal defendants never conducted a meaningful internal investigation into his misconduct, never disciplined him, and did not ensure that he was more closely supervised despite the obvious risk he posed, leaving him free to act with impunity.

193.    Before the wrongful conviction of Keith West, Louisville's final policymakers were on actual and/or constructive notice of these unconstitutional customs and resulting misconduct the Louisville police including Defendants named herein:

194.    Despite their notice of ongoing lapses of constitutional magnitude, the municipal defendants' supervisors and final policymakers, acting with deliberate indifference, failed to train, supervise, discipline, or otherwise remediate Louisville police officers.

## Defendant Finch's Contemporaneous Misconduct

195.    In 2009, Defendant Finch pleaded guilty to 112 counts of stalking, harassment, official misconduct, and perjury.

196.    The Commonwealth charged Defendant Finch with one count of stalking for threatening, intimidating, and harassing his former wife, Pamela Finch, between 2005 and 2008.

197.    The conduct underlying this charge was Defendant Finch's threats to his former wife with a knife after following her when she was visiting a friend's home, and his threats to her while she was traveling out of state.

198.    The Commonwealth charged him with 53 counts of harassing communications for making telephone calls with no legitimate purpose in an effort to harass and intimidate others between August and September 2008.

199.    The Commonwealth charged Defendant Finch with one count of unlawfully accessing data belonging to his former wife between August and September 2008.

200.    The Commonwealth charged Defendant Finch with 53 counts of official misconduct for abusing his official position to conduct surveillance and investigation into his former wife, between August and September 2008.

201.    Finally, the Commonwealth charged Defendant Finch with one count of perjury for making a false statement under oath on September 29, 2008.

202.    Defendant Finch used his position as a detective to stalk and harass his former wife.

203.    He used to detective credentials to access phone numbers and personal information about individuals he believed were associating with his former wife.

204.    Defendant Finch made repeated harassing phone calls to his former wife and her friend and used LMPD computers to view web cams of the hotel were his former wife was staying on vacation.

205.    Defendant Finch abused his position to track the whereabouts of his wife and her associates, and investigated her whereabouts by falsely representing that he was investigating in his capacity as a detective.

206.    A grand jury returned an Indictment charging Defendant Finch with 110 counts of misconduct, described above.

207.    Detective Finch's disturbing conduct occurred at the same time as his investigation into Ms. Carr.

208.    The Commonwealth was on notice of Defendant Finch's harassing, intimidating, and threatening behavior, but permitted him to serve as lead investigator in a murder case.

209.    The Commonwealth never disclosed this exculpatory evidence of Defendant Finch's official misconduct, abuse of power, and threatening, harassing, and intimidating behavior toward others.

## Ms. Carr's Exoneration

210.    Ms. Carr was arrested January 6, 2006 for Mr. Adolphe's murder.

211.    On May 28, 2008, Ms. Carr took an *Alford* Plea to manslaughter, conspiracy to commit burglary, conspiracy to commit robbery, and tampering with physical evidence.

212.    On December 6, 2019, Ms. Carr submitted an application for a pardon to Kentucky Governor Matthew Bevin based on her actual innocence.

213.    The application contained a letter from Ms. Carr, and three supporting letters from individuals familiar with her case.

214.    Ms. Carr's letter explained that she spent more than 12 years in prison and on parole for a crime she did not commit.

215.    Ms. Carr's letter also explained that the only evidence against her was a statement from one of her codefendants and a statement from a jailhouse snitch. Both of these individuals had recanted their statements.

216.    The three supporting letters all stressed Ms. Carr's actual innocence.

217.    On December 9, 2019, Governor Bevin pardoned Ms. Carr based on her actual innocence pardon request.

**Plaintiff's Damages**

218.    At just 16 years old, Ms. Carr was a child when she was arrested. She had completed her GED and planned to complete her paralegal certification. Maliciously arrested and prosecuted for Mr. Adolphe's death, the Defendants' misconduct deprived Ms. Carr of the most formative years of her life. She is traumatized to this day.

219.    Instead of pursuing her education, Ms. Carr spent the next 12 years imprisoned and on parole for a crime she did not commit.

220.    Ms. Carr was removed from her family and friends and prevented from pursuing education, job opportunities, and relationships.  She missed out on her teenage and young adult years, and on holidays, birthdays, and family gatherings.

221.    Ms. Carr missed out on opportunities to attend school, engage in meaningful work, to develop her career, and to pursue her interests and passions. She has been deprived of all the basic pleasures of human experience, from the simplest to the most important, which all free people enjoy as a matter of right, including the right to live as an autonomous human being.

### Plaintiff's Claims
### Count 1 – 42 U.S.C. § 1983
### Unreasonable Prosecutorial Seizure

222.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

223.    As described more fully above, all of the Defendant Officers, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Ms. Carr of her constitutional right to be free from unlawful prosecution and continued detention without probable cause.

224.    In the manner described more fully above, the Defendant Officers made, influenced, and/or participated in the decision to prosecute Ms. Carr for murder, for which there was no probable cause and which caused Ms. Carr to suffer a deprivation

of liberty. Their misconduct included falsifying evidence and withholding exculpatory and impeachment evidence.

225.    As described more fully above, the prosecution was resolved in Ms. Carr's favor.

226.    The Defendant Officers' misconduct directly resulted in the unlawful prosecution and continued deprivation of Ms. Carr's liberty, violating her constitutional rights.

227.    As a result of this violation of her constitutional rights, Ms. Carr suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

228.    The Defendant Officers' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Ms. Carr's constitutional rights.

229.    The misconduct described in this Count was undertaken pursuant to a routine practice of the LMPD to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.    In this way, the municipal defendants violated Ms. Carr's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

230.    These widespread practices, so well settled as to constitute de facto policy in the LMPD, were able to exist and thrive because municipal policymakers

with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

231.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count II – 42 U.S.C. § 1983
### Due Process

232.    Each of the paragraphs in this Complaint is incorporated as if restated fully herein.

233.    As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, caused Ms. Carr to enter a constitutionally invalid guilty plea.

234.    In the manner described more fully above, the Defendants conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence.  Absent this misconduct, the prosecution of Ms. Carr could not and would not have been pursued.

235.    The Defendants' misconduct also directly resulted in the unjust criminal conviction of Ms. Carr, denying her the constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

236.    As a result of this violation of her constitutional right to a fair trial, Ms. Carr suffered injuries including emotional distress, as is more fully alleged above.

237.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Ms. Carr's constitutional rights.

238.    The misconduct described in this Count was undertaken consistent with a routine practice of LMPD to pursue wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Ms. Carr's rights by maintaining policies and practices that drove the foregoing constitutional violations.

239.    These widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count III – 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments Fabrication of False Evidence

240.    Each paragraph of this Complaint is incorporated as if restated fully herein.

241.    In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements attributed to witnesses, and fabricated testimony offered to the grand jury and other pretrial proceedings. The Defendant Officers knowingly fabricated this evidence and a reasonable likelihood exists that the false evidence affected the decision of the grand jurors, Ms. Carr's decision to take an *Alford* plea, and courts considered this false evidence when

deciding whether probable cause existed and whether to accept Ms. Carr's *Alford* plea.

242.    The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

243.    The Defendant Officers' misconduct directly resulted in the unjust incarceration of Plaintiff, thereby denying her from her constitutional right to due process and guaranteed by the U.S. Constitution.    Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.

244.    As a direct and proximate result of the Defendant Officers' actions, Plaintiff's constitutional rights were violated and she suffered from injuries and damages, including loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries as set forth above.

## Count IV – 42 U.S.C. § 1983
## Supervisory Liability

245.    Each paragraph of this Complaint is incorporated as if restated fully herein.

246.    The continued wrongful detention of Plaintiff was caused by the deliberate indifference and recklessness of supervisory defendants, including Defendant Sergeants Pitcock and Hellinger, when he failed to adequately train and supervise the individual defendant officers.

247.    Specifically, this supervisory defendant was personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and

recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

248.    Furthermore, these supervisory defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

249.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

250.    The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

251.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

## Count V - 42 U.S.C. § 1983
## Failure to Intervene

252.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

253.   In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

254.   As a result of the Defendant Officers failure to intervene to prevent the violation of Ms. Carr's constitutional rights, Ms. Carr suffered pain and injury, as well as emotional distress.

255.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Ms. Carr's rights.

256.   The misconduct described in this Count was undertaken pursuant to the policy and practice of the LMPD in the manner described more fully in preceding paragraphs 173–185, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count VI – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

257.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

258.   After Mr. Adolphe was murdered, the Defendant Officers reached an agreement amongst themselves to frame Ms. Carr for the crimes, and to thereby

deprive Ms. Carr of her constitutional rights and his liberty to be continuously taken
away from her, all as described in the various Paragraphs of this Complaint.

259.    In this manner, the Defendant Officers, acting in concert with other
unknown co-conspirators, conspired by concerted action to accomplish an unlawful
purpose by unlawful means.

260.    In furtherance of the conspiracy, each of the co-conspirators committed
overt acts and was an otherwise willful participant in joint activity.

261.    As a direct and proximate result of the illicit prior agreement referenced
above, Ms. Carr's rights were violated, and she suffered financial damages, as well as
severe emotional distress and anguish, as is more fully alleged above.

262.    The misconduct described in this Count was undertaken with malice,
willfulness, and reckless indifference to the rights of others.

263.    The misconduct described in this Count was undertaken pursuant to the
policy and practice of the LMPD in the manner described more fully in above, and
was tacitly ratified by policymakers for the municipal defendants with final
policymaking authority.

### Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Louisville Jefferson County Metro Government

264.    Each of the Paragraphs of this Complaint is incorporated as if restated
fully herein.

265.    The actions of LMPD officers in withholding material exculpatory
information from Ms. Carr and her counsel were undertaken pursuant to the policies

and practices of the LMPD, described above, which were ratified by policymakers for the Louisville Jefferson County Metro Government with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers on the requirements concerning the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

266. The policies and practices described in this Count were maintained and implemented by the Louisville Jefferson County Metro Government with deliberate indifference to Plaintiff's constitutional rights.

267. As a direct and proximate result of the Metro Government's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

268. The Louisville Jefferson County Metro Government is therefore liable for the misconduct committed by its officers.

## Count VIII – State Law Claim
## Malicious Prosecution

269. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

270. Through their actions as described above, the Defendant Officers caused Ms. Carr to be improperly subjected to a prosecution for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Ms. Carr's favor.

271.    The Defendant Officers accused Ms. Carr of criminal activities knowing those accusations to be without genuine probable cause; fabricated evidence and withheld the manner in which that evidence was fabricated; and made statements and reports to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

272.    The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment and/or official responsibilities.

273.    As a result of this misconduct, Ms. Carr suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

### Count IX – State Law Claim
### Negligent Supervision

274.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

275.    The municipal defendants, as well as the supervisory defendant Pitcock had a duty to properly train and supervise officers, detectives, and supervisor employees of the LMPD, and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

276.    The municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of the Defendant

Officers, resulting in Ms. Carr being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

277.    As a result of this misconduct, Ms. Carr suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

**Count X – State Law Claim**
**Intentional Infliction of Emotional Distress**

278.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

279.    As described more fully in the preceding paragraphs, by framing Ms. Carr for a murder she did not commit, the Defendant Officers intended to cause emotional distress, or knew or should have known that their actions would result in serious emotional distress.

280.    In doing so, the Defendant Officers' conduct was extreme and outrageous, going beyond all possible bounds of decency such that it can be considered completely intolerable in a civilized society, and this conduct caused Carr to suffer serious emotional distress of the nature no reasonable person could be expected to endure.

281.    The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment.

282.    As a result of this misconduct, Ms. Carr sustained injuries, including emotional pain and suffering, as is more fully alleged above.

## Count XI
## Respondeat Superior

283.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

284.    In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the LMPD, acting at all relevant times within the scope of their employment.

285.    Defendants City of Louisville and Metro Government as successor to the City of Louisville are liable as principals for all state law torts committed by their agents.

WHEREFORE, Plaintiff, Johnetta Carr, respectfully requests that this Court enter judgment in her favor and against Defendants CITY OF LOUISVILLE, Kentucky; Louisville Police Officers TONY FINCH, JAMES HELLINGER, GARY HUFFMAN, TERRY JONES, JIM LAWSON, TROY PITCOCK, & SHAWN SEABOLT, in their individual capacities, and other unknown officers from the Louisville Police Department; awarding compensatory damages, attorneys' fees and costs against each Defendant, and punitive damages against each of the individual defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, JOHNETTA CARR hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/  Amy Robinson Staples
*One of Plaintiff's Attorneys*

Michael Kanovitz
Elliot Slosar*
Amy Robinson Staples
Margaret E. Campbell*
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902

*\* Pro Hac Vice Motion Forthcoming*